UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SUSAN LEIB,                          :
         Plaintiff          :        No. 1:11-CV-2042
                                     :
    v.                               :        (Judge Caldwell)
                                     :
CAROLYN W. COLVIN, ACTING   :
COMMISSIONER OF SOCIAL      :
SECURITY,                            :
         Defendant          :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Susan Leib's claim for social security disability insurance benefits and denying in part her claim for supplemental security income benefits.[1]

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Leib met the insured status requirements of the

---

1.  As will be explained in more detail *infra* Leib was found disabled as of July 18, 2010.  This was a denial in part because Leib filed her SSI application on May 26, 2009, and she alleged that she became disabled on November 11, 2007. The alleged disability onset date has no impact on Leib's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501.  Consequently, Leib was not eligible for SSI benefits for any period prior to June 1, 2009.

Social Security Act through December 31, 2009. Tr. 10, 12, 43, 121 and 129.[2]  In order to establish entitlement to disability insurance benefits Leib was required to establish that she suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

On May 26, 2009, Leib filed protectively[3] applications for disability insurance benefits and supplemental security income benefits. Tr. 76-77, 95-110 and 129.  On January 8, 2010, the Bureau of Disability Determination[4] denied Leib's applications. Tr. 78-87.  On January 28, 2010, Leib requested a hearing before

_____

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of her Answer on January 9, 2012.

3.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 79 and 84.

an administrative law judge. Tr. 90-91.  After about 11 months had
passed, a hearing was held on December 7, 2010. Tr. 38-75.  On
January 11, 2011, the administrative law judge issued a decision
denying Leib's claim for disability insurance benefits and
granting her application for supplemental security income benefits
as of July 18, 2010. Tr. 10-18.  The administrative law judge
concluded that Leib failed to prove that she suffered from a
disability on or prior to December 31, 2009,  her date last
insured. Id.  However, the administrative law judge found that
Leib could not perform her prior relevant work and was limited to
a range of sedentary work.  Id. The administrative law judge then
applied the Medical-Vocational Guidelines in a non-mechanical
fashion and designated her an individual closely approaching
advanced age.[5] Id. Based on that designation and Medical
Vocational Rule 201.14 the administrative law judge found that
Leib was disabled and entitled to supplemental security income

---

5.  Leib was 49 years of age at the time of the administrative
hearing. The ALJ found that she was disabled for purposes of SSI
benefits as of July 18, 2010, which was six months before her
50th birthday. Under the Social Security regulations a person 50
to 54 years of age is considered a "person closely approaching
advanced age."  20 C.F.R. §§ 404.1563(c) and 416.963(c).  The
Social Security Administration considers a claimant 50 to 54 who
has a severe impairment and limited work experience as someone
who may not be able to adjust to other work. Id.  As noted the
ALJ applied this category in a non-mechanical fashion and found
that she was disabled 6 months prior to her 50th birthday, July
18, 2010. Under Medical-Vocational Rule 201.14, a person
designated an individual closely approaching advanced age who is
unable to perform prior relevant work, and with the same work and
educational background as Leib, is considered disabled. See
Medical-Vocational Rules 201.00(g) and  201.14, 20 C.F.R. Part
404, Subpart P, Appendix 2.

benefits if she met the non-disability requirements for such benefit payments. Id.  The administrative law judge directed that the "component of the Social Security Administration responsible for authorizing supplemental security income [] advise [Leib] regarding the nondisability requirements for [SSI] payments, and if eligible, the amount and the months for which payment [would] be made." Tr. 18.

On January 26, 2011, Leib requested that the Appeals Council review the administrative law judge's decision and on September 12, 2011, the Appeals Council concluded that there was no basis upon which to grant Leib's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Leib then filed a complaint in this court on November 2, 2011.  Supporting and opposing briefs were submitted and the appeal[6] became ripe for disposition on April 12, 2012, when Leib filed a reply brief.

Leib, who was born in the United States on January 18, 1961, graduated from high school in 1980, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 44, 76-77, 95, 143, 151 and 156. During her elementary and secondary schooling, Leib attended

---

6.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

regular education classes. Tr. 151. After graduating from high

school, Leib completed training to become a cosmetologist. Tr. 47

and 151. Leib has a driver's license and drives short distances

once or twice per week. Tr. 45.

Leib held two jobs which can be considered past relevant

employment.[7] Those positions were as an inspector of

textile/clothing products which was described by a vocational

expert as semi-skilled, light work, and as a machine operator

which was described as skilled, medium work[8] as generally

---

7. Past relevant employment in the present case means work
performed by Leib during the 15 years prior to the date her claim
for disability benefits was adjudicated by the Commissioner. 20
C.F.R. §§ 404.1560 and 404.1565.

8. The terms sedentary, light and medium work are defined in the
regulations of the Social Security Administration as follows:

   (a) *Sedentary work*. Sedentary work involves lifting no
   more than 10 pounds at a time and occasionally lifting
   or carrying articles like docket files, ledgers, and
   small tools. Although a sedentary job is defined as
   one which involves sitting, a certain amount of walking
   and standing is often necessary in carrying out job
   duties. Jobs are sedentary if walking and standing are
   required occasionally and other sedentary criteria are
   met.

   (b) *Light work*. Light work involves lifting no more
   than 20 pounds at a time with frequent lifting or
   carrying of objects weighing up to 10 pounds. Even
   though the weight lifted may be very little, a job is
   in this category when it requires a good deal of
   walking or standing, or when it involves sitting most
   of the time with some pushing and pulling of arm or leg
   controls. To be considered capable of performing a
   full or wide range of light work, you must have the
   ability to do substantially all of these activities.
   If someone can do light work, we determine that he or
   she can also do sedentary work, unless there are

(continued...)

performed in the economy but light work as actually performed by Leib. Tr. 64 and 133-142.

Records of the Social Security Administration reveal that Leib had earnings in the years 1977 through 1980, 1982, 1989, 1990, and 1999 through 2004. Tr. 113 and 123. Leib's highest annual earnings were in 2001($17,979.73). Id. Leib's total reported earnings were $108,907.64. Id. Leib testified at the administrative hearing that she has not worked since September 3, 2004, the date she was involved in a motor vehicle accident. Tr. 44.

Although Leib claims she has not worked since September, 2004, Leib when she filed her application for disability insurance benefits alleged that she became disabled on November 11, 2007. Tr. 104. Leib contends that she suffers from low back, neck, arm and hand pain; bulging discs; headaches; left hip pain; and depression. Tr. 48-49, 78, 83 and 144.

In a "Function Report - Adult" dated July 28, 2009, Leib

_____

8. (...continued)
       additional limiting factors such as loss of fine
       dexterity or inability to sit for long periods of time.

       (c) *Medium work*. Medium work involves lifting no more
       than 50 pounds at a time with frequent lifting or
       carrying of objects weighing up to 25 pounds. If
       someone can do medium work, we determine that he or she
       can do sedentary and light work.

20 C.F.R. §§ 404.1567 and 416.967.

indicated that she performed a range of daily activities. Tr. 161-168.  Leib lived with her husband and son. Id.  She stated that she had no problem with her personal care. Tr. 162.  In addition, she prepared simple meals daily, performed light dusting, and cleaned the storm door of her house. Tr. 163.  Leib went outside daily, walked, drove, and grocery shopped with her husband every week. Tr. 164.  Leib reported that she could lift up to 10 pounds and walk 100 feet without resting. Tr. 166.  In the "Function Report," Leib when asked to check items which her "illnesses, injuries, or conditions affect" did <u>not</u> check talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others. Tr. 166.

For the reasons set forth below we will affirm the decision of the Commissioner.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir.

7

1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); <u>Cotter
v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71
F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176
(4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565
(1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197,
229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d
198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360
(3d Cir. 1999). Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
<u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment

9

or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has

---

9.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation
(continued...)

an impairment or combination of impairments that meets or equals
the requirements of a listed impairment,[11] (4) has the residual
functional capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the national
economy. Id. As part of step four the administrative law judge
must determine the claimant's residual functional capacity. Id.[12]

---

10. (...continued)
process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b). An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience." Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

12. If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records.

Leib was involved in a motor vehicle accident on September 3, 2004. Tr. 193. After the accident Leib was taken to Pottsville Hospital and Warne Clinic, Pottsville, Pennsylvania. Tr. 183. The only hospital record from that date submitted during the administrative proceedings is an x-ray report of the lumbosacral spine which states that "[n]o significant abnormalities [were] seen[.]" <u>Id.</u>

Six days later on September 9, 2004, Leib had an x-ray of the cervical spine at the Pottsville Hospital which revealed the following "1. Disc space narrowing of the C4-C5 level and to a lesser degree the C5-C6 level. 2. Slight osseous encroachment on the right at the C4-C5 and C5-C6 levels." Tr. 182. Then on September 30, 2004, Leib had an MRI of the cervical spine and an MRI of the lumbosacral spine performed at the same facility. Tr. 181 and 185-186. The MRI of the cervical spine revealed: "1. At C4-5, degenerative bulging disc with associated osseous degenerative changes. Mild central canal and right neural canal stenosis. 2. At C5-6, small focal posterior right-sided paramedial protrusion of the degenerative disc." Tr. 186. The MRI of the lumbosacral spine revealed: "1. No abnormal disc protrusion or significant osseous abnormalities are demonstrated in the lumbosacral spine. 2. Mild spinal stenosis at L4-5."[13] Tr. 185.

---

13. The neural canals or foramina are openings through which nerve roots exit. "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on you spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back. While some people have no signs or symptoms, spinal stenosis can cause pain, numbness, muscle weakness, and problems with bladder or bowel function." Spinal Stenosis, Definition, Mayo Clinic staff, Mayoclinic.com, http://www.mayoclinic.com/health/spinal -stenosis/DS00515 (Last accessed April 5, 2013). These MRIs revealed mild foraminal and spinal stenosis at the C4-C5 level of the cervical spine and mild spinal stenosis at the L4-L5 level of the lumbar spine.

The next medical record we encounter is a report of an
appointment Leib had with Barry A. Silver, M.D., of North Penn
Orthopaedic Associates, Lansdale, Pennsylvania, on December 11,
2004. Tr. 193-195.  Dr. Silver in the report of this appointment
under History of Present Illness stated as follows:

> This patient was driving her own car on 9/3/04 and was
> at a stop sign and was rear-ended. She was not knocked
> unconscious but did go to a hospital and then came under
> the care of a number of doctors including her family
> doctor, Dr. Lord, Dr. Wheeler who is an orthopaedic
> surgeon and a Dr. Chaudry and she does not know what
> kind of doctor he is.  She has been undergoing [physical
> therapy] up in Schuylkill Haven but she only thinks
> she is about 20% better and a number of studies have
> been done.
>
> On close questioning she is not really complaining of
> tingling constantly.  Says she had a little pain in
> her arm today and she is not really having pain
> radiating down into her legs.

Tr. 193.  At the time of this appointment, the only medication
Leib was taking was Naproxen.[14] Id.  A physical examination
revealed that Leib's vital signs were stable and she had a normal
gait and station. Id.  Dr. Silver reported that Leib's cervical
range of motion was as follows: flexion to 40 degrees, extension

---

14.  Naproxen (brand names include Aleve, Anaprox, Naprosyn) is a
nonsteroidal anti-inflammatory pain medication used to treat
conditions such as arthritis and tendinitis, Naproxen, Drugs.com,
http://www.drugs.com/naproxen.html (Last accessed April 4, 2013).

to 50 degrees, lateral turning to left and right 45 degrees.[15] Tr.
193-194.  Leib had a negative Spurling's Test.[16] Tr. 194.  Leib
had generalized tenderness in the lumbar region but was able to
bend to around 70 degrees[17] and she had "no list or spasm."[18] Id.
Leib had normal movement of the shoulders and she had no evidence
of deformity in her arms or legs. Id.  Leib's reflexes in the

------

15.  Normal flexion is 40 to 60 degrees and extension 45 to 70
degrees.  Normal Neck Range of Motion, Livestrong.com,
http://www.livestrong.com/article/95456-normal-neck-range-motion/
(Last accessed April 4, 2013). Dr. Silver uses the term
"laterally turns" to the left and right which, giving Leib the
benefit of the doubt, we interpret as rotation of the neck.
Normal rotation of the neck is 60 to 80 degrees. Id.  Dr. Silver
did not report on lateral bending (bending your neck so that your
ear leans toward your shoulder). Normal lateral bending is 45
degrees. Id.

16.  The Spurling's test is an examination to determine whether a
patient suffers from cervical spondylosis or radiculopathy.  It
is an "evaluation for cervical nerve root impingement in which
the patient extends the neck and rotates and laterally bends the
head toward the symptomatic side; an axial compression force is
then applied by the examiner through the top of the patient's
head; the test is considered positive when the maneuver elicits
the typical radicular arm pain."  MediLexicon, Definition:
'Spurling Test," http://www.medilexicon.com/medicaldictionary
.php?t=90833 (Last accessed April 4, 2013).

17.  Normal range of lumbar flexion (bending) is 60 degrees.
Normal Range of Motion in Back Extension and Flexion,
Livestrong.com, http://www.livestrong.com/article/503207-normal
-range-of-motion-in-back-extension-and-flexion/ (Last accessed
April 7, 2013).

18.  One definition of "list" is to lean or cause to lean to the
side.

15

upper and lower extremities were normal/low normal[19] and she had

normal motor power and sensory findings. <u>Id.</u>  After conducting the

physical examination and reviewing the recent x-rays and MRIs, Dr.

Silver's impression was that Leib suffered from an "[a]cute

cervical injury superimposed on degenerative disc disease and

small herniation at [the C5-C6 level] but without much in the way

of radicular symptoms and lumbar strain, rule out discogenically

origined pain." <u>Id.</u>  Dr. Silver recommended that Leib continue

with physical therapy for the neck and back. Id.  He further

stated he did not believe she was capable of work "in her present

condition and should stay on her Naprosyn." <u>Id.</u>

     Leib had follow-up appointments with Dr. Silver on

January 15, February 19 and May 7, 2005. Tr. 190-192.

     In the report of the January 15, 2005, appointment Dr.

Silver noted that Leib had "driven again all the way down from the

Poconos pretty much to see me.  I am now the only doctor she is

following with . . . There has been no worsening and there is no

---

19.  Deep tendon reflexes are generally measured on a scale of 0
(absent), 1+ (trace/diminished/low normal), 2+ (normal), 3+
(brisk), 4+(nonsustained clonus), and 5+ (sustained clonus).
Reflexes at 0, 4+ and 5+ are usually considered abnormal. <u>See</u>
Deep Tendon Reflexes, Neuroexam.com, http://www.neuroexam.com
/neuroexam/content.php?p=31 (Last accessed April 7, 2013). Dr.
Silver noted that Leib's deep tendon reflexes in the upper
extremities were 2+ in the biceps, 2+ in the triceps and 1+ in
the brachial radialis; and in the lower extremities 1+ in the
knees and 1+ in the ankles.

problem with increasing pain in her arms and really no pain in her legs." Tr. 192. Leib's cervical flexion was about 40 degrees and her extension 45 degrees and she turned her head 45 degrees to the left and the right. Id. The Spurling's Test was negative. Id. Leib had mild tenderness in the lumbar region and she was able to bend to 80 degrees. Id. Leib had a negative straight leg raising test[20] and "[o]nce again she [had an] absolutely normal neurological exam."[21] Id. Dr. Silver concluded that Leib was not a candidate for surgical intervention and that she had "made some progress but this is going to be very slow." Id. He advised her to continue with physical therapy. Id.

At the appointment with Dr. Silver on February 19, 2005, Leib reported that her neck pain was down to a 2 or 3 on scale of 0 to 10 and reported that her back was "much better." Tr. 191. The results of a physical examination were essentially normal other than cervical rotation which was still 45 degrees to the left and right. Id. Leib was able to bend to 90 degrees; she had

---

20. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed April 4, 2013).

21. The neurological examination included testing of Leib's reflexes, motor power and sensation.

a negative straight leg raising test and a negative sitting root test;[22] and her neurological examination was completely normal. Id. Dr. Silver stated that he was convinced that Leib would continue to improve without surgical intervention or any pain management in terms of injections and he noted that she could return to work "on a trial basis and see what happens." Id. Similar findings were made at the appointment on May 7, 2005. Tr. 190.

Leib did not return to see Dr. Silver until April 1, 2006. Tr. 189. At that appointment Leib complained of low back pain. Id. Leib told Dr. Silver that her neck was better than her back and that she never has leg pain and "on close questioning" admitted that she had "no numbness or tingling in her arms." Id. A physical examination revealed generalized tenderness in the lumbar region; she could bend to 80 degrees; straight leg raising test and the sitting root test produced some minor back pain but no leg pain; she had "quite good, almost perfect" neck movement and she had a normal neurological examination. Id. Dr. Silver ordered a new MRI of the lumbar spine which was performed on April 8, 2006, and revealed "mild degenerative findings" and "[n]o focal disc protrusion at any level." Tr. 196.

_____

22. The sitting root test (SRT) is a test for sciatic nerve pain.

On May 20, 2006, Leib had an appointment with Dr. Silver to discuss the MRI results. Tr. 188. In the report of that appointment Dr. Silver stated that "[t]here is certainly no evidence of any major increasing problem." Id. Dr. Silver told Leib she was not a candidate for surgery. Id.

There is no documentation of treatment in the record for the period May 20, 2006, through May, 2008, for Leib's alleged impairments and symptoms.

On June 9, 2008, Leib had an appointment with Kenneth J. Lord, M.D.,[23] regarding a dental abscess. Tr. 199. At that appointment Leib denied any change in energy or weight; Leib reported that she had no shortness of breath, dyspnea (labored respiration), chest pain, abdominal pain, lightheadedness, dizziness, weakness or numbness, or syncope (fainting). Id. There is no indication that she made any complaints regarding back or neck pain. Id. A neurological examination was completely normal. Id.

In August, 2008, Leib complained of neck pain radiating to her right shoulder and tingling in her thumb, which she stated began six days earlier. Tr. 203, 283 and 301. A physical examination by Dr. Lord revealed a supple neck and some mild

_____

23. Dr. Lord is a family practitioner located in Orwigsburg, Pennsylvania. Tr. 199. He is affiliated with Geisinger Health System. Id.

19

right-sided paracervical muscle tenderness. Tr. 203. Although her back had some muscle tenderness and spasm to the right trapezius muscle, her extremity examination revealed normal range of motion, no gross defects and normal joints. Id. She also had a completely normal neurological examination. Id. Dr. Lord's assessment was that Leib suffered from a neck sprain and recommended she alternate the application of ice and moist heat to the neck and wear a soft cervical collar at bedtime. Id. Dr. Lord also prescribed the medications Naproxen and Flexeril.[24] Tr. 204.

In October, 2008, Leib was referred by Dr. Lord to John P. Carlson, M.D., a neurologist at Geisinger Medical Center. Tr. 216-218. Dr. Carlson reported that Leib could walk independently. Tr. 217. He reported that Leib had a decreased ability to tilt her head with lateral bending to the right side and was tender over the posterior neck muscles over her right side. Id. Although she had decreased reflexes and weakness of her right biceps and brachioradialis muscles and decreased sensation to pinprick in her

---

24. Flexeril, a muscle relaxant, is used, inter alia, to treat pain. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed April 5, 2013).

right hand, Leib had no hemiparesis,[25] pronator drift,[26] or ataxia

of her arms.[27] Tr. 217.  Dr. Carlson's impression was that Leib

suffered from status post motor vehicle accident in September 2004

with residual neck pain and right arm pain, numbness and weakness;

and a history of injury to her back at the time of the motor

vehicle accident. Id.  Dr. Carlson referred Leib to physical

therapy; however, Leib attended only two sessions secondary to

financial concerns because her insurance copayment was $35. Tr.

234 and 263.  Dr. Carlson prescribed Leib a home cervical traction

unit for a period of four months. Tr. 268.

On October 13, 2008, Leib had an MRI of the cervical

spine performed at the Schuylkill Medical Center which revealed an

interval increase in the size of the right paracentral disc

extrusion at C5-C6 with mild spinal stenosis and disproportionate

---

25.  Hemiparesis is defined as "muscular weakness or partial
paralysis affecting one side of the body." Dorland's Illustrated
Medical Dictionary, 837 (32nd Ed. 2012).

26.  Pronator drift is indicative of upper motor neuron weakness.
A patient is asked to close his or her eyes and extend the arms
at shoulder level with the palms facing upward.  If the patient
cannot hold the position for 20 or 30 seconds and the palm(s)
drift(s) downward the test is positive. See Rank, Wendi, MSN, RN,
CNRN, CRNP, Assessing for pronator drift,http://journals.lww.com/
nursing/Fulltext/2013/04000/Assessing_for_pronator_drift.18.aspx
(Last accessed April 5, 2013).

27.  Ataxia is defined as "failure of muscular coordination;
irregularity of muscular action."  Dorland's Illustrated Medical
Dictionary, 170 (32nd Ed. 2012).

right foraminal stenosis; degenerative disc disease particularly severe at C4-C5 with worsening from her prior study from 2004; and multilevel predominantly right-sided low grade foraminal narrowing due to uncovertebral degenerative spurring. Tr. 267.

On October 22, 2008, Dr. Carlson reported that the cervical MRI showed worsening of the previous disc disease and foraminal stenosis. Tr. 211-212. Leib reported some relief from her medications and her physical examination revealed that she had a good gait. Tr. 211.

On November 25, 2008, Leib was examined by Darren Jacob, D.O., a neurosurgeon, at Geisinger Medical Center based on a referral from Dr. Lord and Dr. Carlson. Tr. 315-317. While Leib complained of neck and back pain, her physical examination revealed full muscle strength in the upper and lower extremities with no focal deficits and an intact gait. Id. She was also able to heel and toe walk,[28] squat, rise, and walk with a tandem gait[29] without significant difficulty. Id. Although Leib had decreased

---

28. The heel walk test requires the patient to walk on his or her heels. The inability to do so suggests L4-L5 nerve root irritation. The toe walk test requires the patient to walk on his or her toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed April 5, 2013).

29. A tandem walk or gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

sensation to pinprick in the right C5-C6 dermatomal distribution,[30] she had a negative Hoffman's sign,[31] Tinel's sign,[32] and straight leg raising test. Id. The straight leg raising test was accomplished painlessly to 90 degrees. Id. Provocative testing of her hands failed to produce any pain or paresthesia[33] bilaterally. Id. Dr. Jacobs's assessment was that Leib suffered from "cervical radiculopathy, improving" and "cervical disk herniation on the right, C5-6." Tr. 317. Dr. Jacobs recommended

---

30. A dermatome is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed April 5, 2013).

31. The Hoffman's sign is a neurological sign in the hand which is suggestive of spinal cord compression. The test involves tapping the nail on the third and fourth finger. "The test is positive for spinal cord compression when the tip of the index finger, ring finger, and/or thumb suddenly flex in response." Hoffman Sign: Red Flag for Cervical Myelopathy, Orthopod, http://www.eorthopod.com/content/hoffmann-sign-red-flag-for-cervical-myelopathy (Last accessed April 4, 2013).

32. A positive Tinel's sign suggests an irritated nerve. It is a test for carpal tunnel syndrome. Carpal Tunnel Syndrome, About.com Orthopedics, http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm (Last accessed April 5, 2013).

33. Paresthesia is a sensation of tingling, prickling, or numbness of the skin, more generally known as the feeling of pins and needles. See Dorland's Illustrated Medical Dictionary, 1383 (32nd Ed. 2012).

"[n]o surgical intervention at this time" and ordered an electromyography test (EMG).[34] Id. He noted that Leib no longer had any pain radiating down her arm and "only had discontiguous hand symptoms." Id. He discussed at length with Leib the fact that she was significantly improving. Id.

Dr. Carlson examined Leib on December 10, 2008, and found that she had decreased sensation to light touch over the palmar surface of the fingers of the right hand; slightly decreased right grip strength but the other muscles of her hand and arm were strong and she had a "[g]ood gait." Tr. 390.

An EMG/Nerve Conduction Study performed on December 15, 2008, was completely normal. Tr. 327. It revealed "no

_____

34. "An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Nerve conduction studies measure how well and how fast the nerves can send electrical signals. . . An EMG is done to: ♦ Find diseases that damage muscle tissue. These problems may include a herniated disc . . . ♦ Find the cause of weakness, paralysis, or muscle twitching. Problems in a muscle, the nerves supplying a muscle, the spinal cord or the area of the brain that controls a muscle can cause these symptoms. The EMG does not show brain or spinal cord disease.  A nerve conduction study is done to: ♦Find damage to the peripheral nervous system, which include all the nerves that lead away from the brain and spinal cord and the smaller nerves that branch out from those nerves . . . ." Electromyogram (EMG) and Nerve Conduction Studies, WebMD, http://www.webmd.com/brain/ electromyogram-emg-and-nerve-conduction-studies (Last accessed April 5, 2013).

electrophysiologic evidence for a mononeuropathy[35] nor for a

radiculopathy[36] in the tested right arm." Id.

For five months, there is no documentation of treatment

until May 6, 2009, when Leib was examined by Dr. Jacobs. Tr. 331-

332. Dr. Jacobs reported the following examination findings: "She

is awake, alert, and oriented to person, place and time. She is

cooperative for interview and examination. Higher cognitive

---

35. "Neuropathy is a collection of disorders that occurs when
nerves of the peripheral nervous system (the part of the nervous
system outside of the brain and spinal cord) are damaged.  The
condition is generally referred to as peripheral neuropathy, and
it is most commonly due to damage to nerve axons [nerve fibers].
Neuropathy usually causes pain and numbness in the hands and
feet. It can result from traumatic injuries, infections,
metabolic disorders, and exposure to toxins. . . Neuropathy can
affect nerves that control muscle movement (motor nerves) and
those that detect sensations such as coldness or pain (sensory
nerves). . . Pain from peripheral neuropathy is often described
as a tingling or burning sensation." Medical New Today, What is
Neuropathy? Neuropathy Causes and Treatments, http://www.
medicalnewstoday.com/articles/147963.php (Last accessed April 5,
2013). "Mononeuropathy is damage to a single nerve or nerve
group, which results in loss of movement, sensation, or other
function of that nerve." Mononeuropathy, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/ency/article/000780.htm
(Last accessed April 5, 2013).

36. Radiculopathy is a condition where one or more nerves or
nerve roots are affected and do not work properly. The nerve
roots are branches of the spinal cord. They carry signals to the
rest of the body at each level along the spine. The nerve roots
exit through holes (foramen) in the bone of spine on the left and
the right. Radiculopathy can be the result of a disc herniation
or an injury causing foraminal impingement of an exiting nerve
(the narrowing of the channel through which a nerve root passes).
See, generally, Radiculopathy, MedicineNet.com, http://www.
medicinenet.com/radiculopathy/article.htm (Last accessed April 5,
2013).

function is preserved. Speech is fluent. Cranial nerves II-XII are grossly intact. Her gait is intact. She is able to heel walk, toe walk, squat, rise and tandem gait without significant difficulty. Motor and Sensory evaluation of her upper and lower extremities reveals no focal deficit noted. She has no Hoffman sign elicited, no clonus elicited,[37] and straight leg raising is accomplished painlessly to 90 degrees bilaterally. Tinel sign is absent at the wrists bilaterally." Tr. 331. Dr. Jacobs's impression was that Leib's symptoms had resolved and there was no need for surgical intervention. Tr. 332. That same month, a follow-up physical examination by Dr. Lord revealed normal extremities, including normal range of motion, joints and reflexes. Tr. 337.

In contrast to the above findings, on September 2, 2009, Dr. Carlson opined that Leib was "totally, permanently, and completely disabled from performing work." Tr. 414-415. Dr. Carlson reported the following examination findings: "She is tender over the posterior cervical muscles bilaterally. She is tender over the insertions of the posterior cervical muscles in the skull. She has decreased range of motion of the neck in all directions, particularly on extension and on lateral bending

---

37. Clonus is "an abnormal pattern of neuromuscular activity, characterized by rapidly alternating involuntary contraction and relaxation of skeletal muscle." Mosby's Medical Dictionary,___ (8th Ed. 2009)

bilaterally.[38] There is no significant weakness in either arm today. Reflexes are decreased throughout. She notes decreased sensation to pinprick over the right foot in the L5 distribution. She limps a little bit on the left leg as she walks. She has bilateral straight leg raise test. She is tender over the lumbar paraspinous muscles. She has decreased extension at the wait (sic) with good forward flexion. There is no definite weakness in the legs, although she does not dorsiflex either foot well.[39] Reflexes in the leg are decreased. She is tender over the volar surface of the left forearm."[40] Tr. 415. Dr. Carlson's impression was "[s]tatus post motor vehicle accident, with residual neck and cervical disk displacement, neck pain, right C6 cervical radiculopathy, lumbar disk disease, low back pain, and sciatica." Id.

On September 14, 2009, John Hower, Ph.D., a state agency psychologist, reviewed Leib's medical records and concluded that

---

38. Dr. Carlson did not specify the decrease in degrees. Consequently, we cannot determine whether it was a significant or minor decrease.

39. Dorsiflexion" is defined as "flexion or bending toward the extensor aspect of a limb[.]" Dorland's Illustrated Medical Dictionary, 560 (32nd Ed. 2012). In the dorsiflexion of the foot, the front part of the foot is bent towards the shin bone.

40. Volar indicates the surface of the forearm contiguous with the palm surface of the hand.

Leib did not have a medically determinable mental impairment. Tr. 344.

On November 6, 2009, Leib was examined by Dr. Lord at which time Leib complained about a dry, non-productive cough. Tr. 420421. At this appointment Leib did not complain about any arm, neck or back pain and she denied suffering from any focal weakness or numbness. Id.

On November 5, 2009, Leib was examined by Leon H. Venier, M.D., on behalf of the Bureau of Disability Determination. Tr. 288-295. After conducting a clinical interview and performing a physical examination of Leib, Dr. Venier's impression was as follows: "1. Complaints of low back pain. 2. Complaints of cervical pain following motor vehicle accident 5 years ago." Tr. 290. The physical examination revealed that Leib had a normal gait and station; Leib's strength was normal in her shoulders, elbows, wrist, hands, hips, knees and ankles;[41] and Leib had normal reflexes and sensation in the upper and lower extremities. Tr. 290. Leib did have "tenderness just about everywhere touched in the upper extremities especially at the shoulders and elbow

_____

41. Motor strength during a neurological examination is rated on a scale of 0 to 5 with 5/5 being normal strength. Strength of Individual Muscle Groups, Neuroexam.com, http://www.neuroexam. com/neuroexam/content.php?p=29 (Last accessed April 5, 2013). There is no indication in the medical records that Leib had anything less than 5/5 motor strength.

joint, wrist, trochanteric. Buttocks over the gluteus medius and also over the paralumbar muscles. Also, pain in both ankles on palpation laterally." Id. A chart completed by Dr. Venier reveals that Leib had essentially normal range of motion in the shoulders, elbows, wrists, hips and spine. Tr. 293-294. Dr. Venier concluded that Leib had the functional ability to engage in a limited range of light work. Tr. 292 and 295.

On November 8, 2009, Dr. Carlson wrote a letter to Leib's attorney in which he stated that in his opinion "to a reasonable degree of medical certainty, Susan Leib is totally, permanently, and completely disabled from work because of injuries that she received in a motor vehicle accident on September 3, 2004." Tr. 422.

On December 30, 2009, Michael J. Brown, D.O. after reviewing Leib's medical records on behalf of the Bureau of Disability Determination concluded that Leib had the functional ability to engage in limited range of light work. Tr. 357-363.

On January 22, 2010, Leib was examined by Dr. Carlson who reported as follows: "She has good strength in both arms and legs. She is tender over the posterior cervical muscles, lumbar paraspinous muscles and anterior iliac crest on the left side. There is no particular tenderness over the left trochanteric

bursa.[42] She has decreased range of motion of her neck and back
because of pain and muscle tightness. She walks with her back and
neck held stiffly because of pain.  There is decreased flexion at
the waist." Tr. 428.  Also, on the same day Dr. Carlson completed
a functional assessment that basically found that Leib was
bedridden. Tr. 369.  He stated, *inter alia*, that in an 8-hour
workday she could stand/walk 0 hours, sit 0 hours and drive a car
0 hours; she had no ability to lift/carry; she could never use
hands for power gripping, simple grasping, medium dexterity, fine
manipulation, and feeling; she could never use her arms and
shoulders for forearm rotation, reaching above and below shoulder
level, pushing/pulling, and bimanual dexterity.

On February 1, 2010, Leib was examined by Shaik Mohd L.
Ahmed, M.D., a pain management specialist. Tr. 435-436.  Leib told
Dr. Ahmed that she did not have radicular pain and that she only
has "intermittent numbness and tingling of the hand and the first
4 digits on the right." Tr. 436.  A neurological examination was
normal, including Leib had a normal gait. Tr. 438. Leib also had
normal strength in the upper and lower extremities bilaterally.
Tr. 439. Although Leib was tender to palpation over the cervical
paraspinal region and bilateral trapezial region, no tenderness

42.  The trochanteric bursa is region near where the femur (upper
leg/thigh bone) connects to the pelvic bone (hip bone).

was observed to palpation over the lumbar, sacrum and coccyx regions of the spine. Id. Leib did have bilateral sacroiliac tenderness. Id. Dr. Ahmed administered a medial branch block to the C3-C6 level of the cervical spine. Tr. 435.

On February 18, 2010, Leib was examined by Dr. Jacobs who in his report of the appointment stated in part as follows:

> [Leib] is a 49-year-old female who I have been following since November of 2008 due to a multitude of complaints predominantly involving neck pain and back pain. She did have some transient upper extremity paresthesia which essentially have resolved completely. I had sent her for an EMG with nerve conduction studies which Dr. Hoffman performed on 12/15/08; however, no radiculopathy or mononeuropathy was uncovered. Dr. Carlson has been following her due to these problems which unfortunately have been worsening. She saw Dr. Ahmed from pain therapy on 12/1/09 and underwent a series of medial branch injections from C3-C6 which failed to significantly ameliorate her symptoms. . . There is no radicular complaint into the arms or into the legs. She denies any focal weakness. She was recently prescribed Tylenol . . . .

Tr. 450-451. A physical examination revealed that Leib's gait remained "intact with slight antalgia;"[43] she was able to heel walk, toe walk, squat and rise, and tandem walk without too much difficulty; and she had no motor or sensory deficits of her upper and lower extremities. Tr. 451. Dr. Jacobs's impression was that

---

43. Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 97 (32nd Ed. 2012).

Leib suffered from cervical and lumbar degenerative disk disease but no surgical intervention was warranted. Id.

On February 26, 2010, Leib underwent a pre-surgical nursing assessment related to a scheduled hysteroscopy D & C. Tr. 483-486 and 489-490. When asked by the registered nurse about any emotional problems, Leib denied that she suffered from depression or anxiety. Tr. 486.

On March 19, 2010, Leib had an MRI of the lumbar spine performed at Geisinger Medical Center. Tr. 508-510. The MRI revealed "mild degenerative changes involving the lower lumbar spine at L3-L4 and L4-L5 levels" and "[a] probable atypical hemangioma in the L1 vertebral body."[44] Tr. 509. Also, on March 19th Leib had an MRI of the cervical spine performed at Geisinger which revealed the following:

> C4-5: There is a prominent posterior disc-osteophyte complex and uncovertebral joint hypertrophy causing mild narrowing of the spinal canal. Mild right neural foraminal stenosis is present.

_____

44. "A spinal hemangioma is a primary, benign tumor most common in the thoracic and lumbar spine. This type of tumor typically affects the vertebral body, but also can affect muscles. The tumor has few symptoms, and is often found on examination for another condition." Scoliosis & Spine Associates, Spinal Tumors, http://www.scoliosisassociates.com/subject.php?pn=spinal-tumors-0 12 (Last accessed April 5, 2013). A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. The vertebral body which is a hard bony structure is the largest part of the vertebra and is somewhat oval shaped.

C5-6: There is a prominent posterior disc-osteophyte
complex, more prominent on the right posterolateral
aspect causing moderate narrowing of the spinal canal
and indenting the anterior contour of the cervical
cord at this level.  Mild to moderate right neural
foraminal stenosis is visualized.

Tr. 511.

**DISCUSSION**

The administrative law judge at step one of the
sequential evaluation process found that Leib had not engaged in
substantial gainful activity since November 11, 2007,  the alleged
disability onset date. Tr. 12.

At step two, the administrative law judge found that
Leib suffers from the following severe impairments: degenerative
disc disease of the cervical and lumbar spine. Id.  The
administrative law judge also found that Leib's alleged depression
was a non-severe impairment because Leib was not taking
medications for that condition or receiving mental health
counseling or treatment. Id.

At step three of the sequential evaluation process the
administrative law judge found that Leib's impairments did not
individually or in combination meet or equal a listed impairment.
Tr. 13.

In addressing step four of the sequential evaluation
process in her decision, the administrative law judge found that
Leib could not perform her past relevant light to medium work as

an inspector and machine operator but that she could perform a
limited range of sedentary work. Tr. 13-16.  Specifically, the
administrative law judge found that Leib could perform sedentary
work as defined in the regulations except she

> is limited to occupations that permit a sit or stand
> option at will. The claimant is also limited to
> occupations that require no more than occasionally
> climbing of ramps or stairs and never requires
> climbing ladders[,] ropes or scaffolds. The claimant
> may occasionally balance, stoop, kneel, crouch, crawl,
> and reach overhead bilaterally with the upper
> extremities.  The claimant may frequently handle and
> finger with the bilateral upper extremities. Lastly,
> the claimant must avoid concentrated exposure to moving
> machinery, hazardous machinery, and unprotected heights.

Tr. 13.  In arriving at this residual functional capacity the
administrative law judge found that Leib's statements about her
pain and functional limitations were not credible. Tr. 14.  In
additional the administrative law judge placed some weight on the
opinions of the state agency physicians who found that Leib could
engage in light work. Tr. 16. However, the administrative law
judge gave Leib the benefit of the doubt and reduced her
functional capacity to the sedentary level. Id.

At step five, the administrative law judge based on the
above residual functional capacity and the testimony of a
vocational expert found that Leib had the ability to perform work
such as a video monitor, information clerk and visual inspector,
and that there were a significant number of such jobs in the

Northeastern region of Pennsylvania. Tr. 17. Consequently, the administrative law judge denied Leib's claim for disability insurance benefits and denied in part her claim for SSI benefits. Tr. 18.

The administrative record in this case is 519 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Leib's medical history and vocational background in her decision. Tr. 10-18. Furthermore, the brief submitted by the Commissioner also adequately reviews the medical and vocational evidence in this case. Doc. 11, Brief of Defendant.

Leib argues that the administrative law judge erred in failing to find that Leib met Listing 1.04A and failing to properly evaluate the opinion of Dr. Carlson, the treating physician. Leib further argues that the ALJ failed to properly assess her credibility and that the ALJ's step 5 determination was a product of legal error.
We find no merit in Leib's arguments.

Leib argues that the relevant Listing is 1.04A-Disorders of the Spine. To satisfy Listing 1.04A, Leib had the burden of proving that she had a disorder of the spine, (e.g.,herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet

arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss (atrophy with associated muscle weakness or muscle weakness); accompanied by sensory or reflex loss; and, if there is involvement of the lower back, with positive straight-leg raising tests in the sitting and supine position.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (2011).

Leib has proffered no medical opinion, nor has she marshaled the evidence in the record, to support her contention that her condition met or equaled the requirements of a listed impairment.  The record is devoid of positive straight-leg raising tests in the sitting and supine position.  Furthermore, Leib does not identify, and the record does not appear to contain, an express finding of nerve root compression.  There is no consistent evidence that Leib had nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, or motor loss accompanied by sensory or reflex loss and positive straight-leg raising during the relevant period at issue.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and

how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. §§ 404.1512© and 416.912©. Leib failed to provide such evidence. No treating or examining physician provided a statement that Leib met the requirements of Listing 1.04A.[45]

Other than conclusory opinions from Dr. Carlson on September 2 and November 8, 2009, no treating or examining physician has indicated that Leib on or before the date last insured of December 31, 2009, suffered from physical or mental functional limitations that would preclude her from engaging in the limited range of sedentary work set by the administrative law judge in her decision for the requisite statutory 12 month period.[46] The ALJ gave an adequate explanation for rejecting the

---

45. Listing 1.04A requires "compromise of a nerve root. . . or spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight leg raising (sitting and supine)."

46. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

opinions of Dr. Carlson, including noting her reliance on the opinions of the state agency physician although giving Leib the benefit of the doubt and reducing Leib's capabilities to the sedentary level.  We note that Dr. Carlson's extreme limitation which cannot be characterized as anything less then depicting an individual that is bedridden are not supported by the objective findings in Dr. Carlson's treatment notes, Leib's testimony at the administrative hearing or the examination findings of Dr. Venier, the state agency physician.

The administrative law judge relied in part on the opinion of Dr. Venier, a state agency physician who examined Leib. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Leib argues that the administrative law judge inappropriately judged her credibility, including her complaints of pain.  The administrative law judge stated that Leib's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of

sedentary work.  The administrative law judge was not required to accept Leib's claims regarding her limitations. <u>See</u> <u>Van Horn v. Schweiker</u>, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  <u>Walters v. Commissioner of Social Sec.</u>, 127 f.3d 525, 531 (6th Cir. 1997); <u>see</u> <u>also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed Leib when she testified at the hearing on December 7, 2010, the administrative law judge is the one best suited to assess the credibility of Leib.

At step five of the sequential evaluation process, the burden of production temporarily shifts to the Commissioner to produce vocational evidence demonstrating that there are a significant number of jobs in the national economy that the claimant, given her residual functional capacity, can perform.

Once the Commissioner satisfies this limited burden of production, the burden shifts back to the claimant to prove that the Commissioner cannot rely on the vocational evidence.

Leib makes the sophomoric argument that the ALJ's step five determination was a product of legal error because the ALJ when framing a hypothetical question for the vocational expert used the language "should avoid concentrated exposure to moving machinery, hazardous machinery and unprotected heights" while the ALJ in her decision states that Leib "must" avoid such exposure. We are satisfied that the vocational expert understood that the hypothetical required that the individual have no concentrated exposure to moving machinery, hazardous machinery and unprotected heights. Consequently, there is no inconsistency between the hypothetical and the ALJ's decision. Furthermore, as noted by the Commissioner none of the positions which the ALJ found that Leib could perform - information clerk, video monitor and visual inspector – required concentrated exposure to moving machinery, hazardous machinery and unprotected heights.[47]

---

47. Leib suggests in her reply brief that the description of the visual inspector position did not preclude concentrated exposure to moving machinery, hazardous machinery and unprotected heights but does not specifically comment on the other two positions – video monitor and information clerk. The Dictionary of Occupational Titles describes the information clerk position (DOT No. 237.367-022) as follows:

(continued...)

Our review of the administrative record reveals that the

<hr>

47.  (...continued)
Answers inquiries from persons entering establishment:
Provides information regarding activities conducted at
establishment, and location of departments, offices, and
employees within organization. Informs customer of location
of store merchandise in retail establishment. Provides
information concerning services, such as laundry and valet
services, in hotel. Receives and answers requests for
information from company officials and employees. May call
employees or officials to information desk to answer
inquiries. May keep record of questions asked.

The video monitor position (DOT No. 379.367-010) is described as
follows:

Monitors premises of public transportation terminals to
detect crimes or disturbances, using closed circuit
television monitors, and notifies authorities by telephone
of need for corrective action: Observes television screens
that transmit in sequence views of transportation facility
sites. Pushes hold button to maintain surveillance of
location where incident is developing, and telephones police
or other designated agency to notify authorities of location
of disruptive activity. Adjusts monitor controls when
required to improve reception, and notifies repair service
of equipment malfunctions.

The visual inspector position (DOT No. 726.684-050) is described
as follows:

Inspects and repairs circuitry image on photoresist film
(separate film or film laminated to fiberglass boards) used
in manufacture of printed circuit boards (PCB's): Inspects
film under magnifying glass for holes, breaks, and bridges
(connections) in photoresist circuit image. Removes excess
photoresist, using knife. Touches up holes and breaks in
photoresist circuitry image, using photoresist ink pen.
Removes and stacks finished boards for transfer to next work
station. Maintains production reports. May place lint free
paper between dry film sheets to avoid scratching circuit
images on film.

The descriptions of these three positions do not suggest that
Leib would come in contact with moving machinery, hazardous
machinery and unprotected in a concentrated manner.

41

decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


 /s/ William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: April 8, 2013

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SUSAN LEIB,                          :
        Plaintiff          :       No. 1:11-CV-2042
                             :
        v.                 :       (Judge Caldwell)
                             :
CAROLYN W. COLVIN, ACTING            :
COMMISSIONER OF SOCIAL               :
SECURITY,                            :
        Defendant          :

<u>ORDER</u>

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1. The Clerk of Court shall enter judgment in favor of the Commissioner and against Susan Leib as set forth in the following paragraph.

2. The decision of the Commissioner of Social Security denying Susan Leib disability insurance benefits and denying in part her claim for SSI is affirmed.

3. The Clerk of Court shall close this case.

                        /s/ William W. Caldwell
                        WILLIAM W. CALDWELL
                        United States District Judge

Dated: April 8, 2013